UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LINCOLN FIN. SEC. CORP. and Barry Horowitz. | : : | |
| Plaintiffs, | : : | No. 20-cv-1132 (VLB) |
| v. | : : | |
| | : | October 20, 2020 |
| BARBARA FOSTER, ET AL. | : | |
| Defendants. | : : : : : | |

### Ruling on Plaintiff's Motion for a Temporary Restraining Order, Dkt. 32

Before the Court is Plaintiff-Respondents Barry Horowitz and Lincoln Financial Securities Corporation's Motion for a Temporary Restraining Order, [Dkt. 32]. Plaintiff-Respondents filed this action seeking a declaratory judgment and injunctive relief to enjoin Defendant-Claimants Barbara Foster, Cheryl Bonomo, and Miriam McCray from continuing with an arbitration proceeding they initiated with the Financial Industry Regulatory Authority ("FINRA") against Plaintiff-Respondents. [Dkt. 1 (Compl.)]. The Plaintiff-Respondents raise a question of arbitrability arguing that the Defendant-Claimants do not have a legal right to compel arbitration because there is no written arbitration agreement between the parties and the Defendant-Claimants were not securities customers of Plaintiff-Respondents within the meaning of FINRA rules. See [*Id.* ¶¶ 1, 4, 13, 26-32]. Plaintiff-Respondents' Motion for a Temporary Restraining Order seeks to enjoin the Defendant-Claimants from proceeding with the arbitration until the Court has ruled on the Plaintiff-Respondents' Motion for a Preliminary Injunction, [Dkt. 18].

1

**For the foregoing reasons, Plaintiff-Respondents' Motion for a Temporary Restraining Order is GRANTED.**

## Background

Plaintiff-Respondent Barry Horowitz is an estate planning attorney. [Dkt. 1 (Compl.) ¶ 11]. Mr. Horowitz registered with Plaintiff-Respondent Lincoln Financial Securities Corporation's ["LFSC"] corporate predecessor in August 1995 and voluntarily terminated his registration with LFSC in August 2018. [Compl. ¶ 12]. The Defendant-Claimants, Barbara Foster, Miriam McCray, and Cheryl Bonomo were Mr. Horowitz's estate planning clients. [Compl. ¶ 13]; *see also* [Dkt. 1-1 (FINRA Statement of Claim) at 3]. The Statement of Claim alleges that Mr. Horowitz intended to use his securities license to recommend investment advisors to his law firm clients, for which he would receive referral compensation, rather than provide investment advice. [Dkt. 1-1 at 3].

The complaint for declaratory relief states that "[i]n his capacity as an attorney and in connection with his estate planning services, Mr. Horowitz referred [law firm] clients to a number of insurance agents for consultations regarding insurance products. In the event of a sale, Mr. Horowitz shared in any associated commissions." [Compl. ¶ 14]. Mr. Horowitz referred his law firm clients to Thomas D. Renison, an insurance agent. [Compl. ¶ 17]. The Statement of Claim alleges that LFSC approved Mr. Horowitz to refer law firm clients to Mr. Renison for compensation. [Dkt. 1-1 at 3]. Mr. Renison and Mr. Horowitz worked together at LFSC but Mr. Renison left LFSC and started an investment advisory business

which he operated in space he rented from Mr. Horowitz's law firm. [Dkt. 1-1 at 4-3].

Plaintiff-Respondents' complaint for declaratory relief states that "[t]he referrals made by Mr. Horowitz to Renison were limited to the potential purchase of insurance products and did not involve the sale of securities." [Compl. ¶ 19]. However, the specific financial products and services that served as the basis for the referral and for the commissions that Mr. Horowitz may have received is unclear in the Defendant-Claimants' Statement of Claim in the arbitration. For example, the Statement of Claim quotes Mr. Horowitz's client agreements, which state "[NHA] often works with financial services organizations [to]…provide investment advice, insurance and/or other financial products or services, and assist [NHA] in collecting financial information from its clients." [Dkt. 1-1 at 6]. The Statement of Claim also alleges that "Mr. Horowitz regularly solicited clients to trust him and NHA with making financial decisions for their retirement – including investment advice." [*Id.* at 11]. None of these allegations, however, are dispositive.

The Court notes that some contracts issued by insurance companies, including certain annuities, must be registered as securities. *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 103 (2d Cir. 2001)(variable annuities are securities under the Securities Litigation Uniform Standards Act). Insurance products, which bear no investment risk, are not securities. *See Ring v. AXA Fin.*, *Inc.*, 483 F.3d 95, 98 (2d Cir. 2007)("…products properly characterized as insurance require the insurer to bear the risks of a poor investment, whereas under a variable annuity contract, the annuitant bears the risks of poor investments.)

The Statement of Claim does not state why Mr. Horowitz referred his clients to Mr. Renison or what products Defendant-Claimants' purchased through Mr. Renison based on Mr. Horowitz's advice. Additionally, the Defendant-Claimants do not allege when Mr. Horowitz referred each of them to Mr. Renison. Nor does it allege that any of the Defendant-Claimants purchased any financial products from LFSC through Mr. Horowitz or Mr. Renison, directly or indirectly.

According to the Statement of Claim, in June 2010, LFSC learned that Mr. Renison was being investigated by the State of Maine. [Dkt. 1-1 at 5-8]. In June 2011, Mr. Renison was criminally charged by the U.S. Department of Justice for conspiracy to commit wire fraud, but the charges were dropped in exchange for Mr. Renison's cooperation and testimony against a co-conspirator. [*Id.* at 8]. In October 2012, Mr. Renison agreed to be barred from transacting business in Maine because of violations of state securities law. [*Id.* at 6-7]. He was later barred from the securities industry by the SEC. [*Id.* at 6]. LFSC allegedly knew of Mr. Renison's arrest and the prior state regulatory action, and that Mr. Horowitz continued to split fees with Mr. Renison, but did not take any action. [*Id.* at 8]. The Statement of Claim does not state whether the fees split were derived from premiums paid on policies or other products purchased before Mr. Renison was investigated and barred.

In late 2013, Mr. Horowitz terminated his business relationship with Mr. Renison when he learned that Mr. Renison was implicated in a fraudulent investment scheme. [*Id.* at 8]; [Compl. ¶ 20]. Mr. Horowitz allegedly did not warn his clients as to Mr. Renison's dealings upon terminating his relationship and Defendant-Claimants continued to invest with Mr. Renison. [Dkt. 1-1 at 8]. Between

two and five years later (2015-2018), on dates unspecified in the Statement of Claim, Claimant-Respondents sold their annuities, other investments, and insurance policies purchased through Mr. Renison to invest in the ARO Equity Fund at Mr. Renison's advice. [Dkt. 1-1 at 9-11, 13-14]. The ARO Equity Fund was a fraud scheme perpetrated by Mr. Renison and others. [*Id.* at 8-10].

The Statement of Claim does not allege that Mr. Horowitz knew of or received any compensation based on Claimant-Respondents' investment in the ARO Equity Fund. In opposition to the Plaintiff-Respondents' Motion for a Preliminary Injunction, the Defendant-Claimants filed a letter dated June 5, 2019 from Mr. Horowitz to Defendant-Claimant Cheryl Bonomo stating that, "many years ago, I referred you to Thomas Renison to assist you with your financial planning needs. Although I am not certain if you chose to use Mr. Renison as your investment adviser, I wanted to alert you to some disturbing information we learned about Mr. Renison." [Dkt. 27-1 (Def. Ex. 1 in Opp'n Pl. Mot. for Prelim. Inj.)]. The letter concludes, "we suggest you seek other financial advice from a different financial adviser" and offers to refer Ms. Bonomo to a different "financial adviser." [*Id.*].

By comparison, Mr. Horowitz filed an affidavit attesting that he maintained three securities brokerage licenses. [Dkt. 10-2 (Pl. Mem. in Supp. of Prelim. Inj.) Horowitz Aff. ¶ 6]. Mr. Horowitz attests that he never provided investment advice to the Defendant-Claimants. [*Id.* ¶ 11]. He attests that he referred them to Mr. Renison "solely for consultations regarding non-securities products, such as life insurance, long-term care insurance, and fixed index annuities." [*Id.* ¶ 12]. Mr. Horowitz attests that he never received compensation from Mr. Renison related to the sale of

5

securities products to the Defendant-Claimants. [*Id.* ¶ 13]. Copies of the Legal Services Agreements between Mr. Horowitz and the Defendant-Claimants accompany Mr. Horowitz's affidavit.

Defendant-Claimants' Statement of Claim alleges that Mr. Horowitz and LFSC are liable for damages caused by investment fraud perpetrated by Mr. Renison based broadly on two legal theories. First, Defendant-Claimants allege that Mr. Horowitz breached his duty of care by recommending that his clients invest with Mr. Renison initially. Next, they allege that Mr. Horowitz failed to warn his clients about the risk of continuing to invest with Mr. Renison. The Defendant-Claimants allege that LFSC failed to supervise Mr. Horowitz as to both issues. [*Id.* at 15-31].

In support of their Motion for a Temporary Restraining order, the Plaintiff-Respondents aver that the parties initially agreed to adjourn all deadlines in the FINRA Arbitration for 30 days to September 7, 2020, pending resolution of the motions for a preliminary injunction. [Dkt. 32-1 (Pl. Resp. Mem. in Supp. Mot. for TRO) at 9]. The adjournment included, but was not limited to, the filing of responsive pleadings and participation in the arbitrator ranking process. [*Id.*]. Plaintiff-Respondents requested an additional 30-day extension during the pendency of their motion for a preliminary injunction. [*Id.*]. The Defendant-Claimants agreed to an extension of the responsive pleading deadline but would not agree to stay the arbitration. [*Id.*]. The Director of FINRA Dispute Resolution Services denied the Plaintiff-Respondents' request to stay the arbitration on September 22, 2020. [Dkt. 32-3 (FINRA Notices)]. The Plaintiff-Respondents' motion

for a temporary restraining order followed as the parties' arbitration rankings were due September 30, 2020. [*Id.*].

## Discussion

### i. Legal Standard

"Federal courts generally have remedial power to stay arbitration." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014). The standard for a temporary restraining order is the same as the standard for a preliminary injunction. *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). The standard for entry of a preliminary injunction or a temporary restraining order overlaps substantially with the standard for a stay. *Nken v. Holder*, 556 U.S. 418, 428 (2009).

To obtain a preliminary injunction, a party seeking the preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quotations and citations omitted). "Such relief, however, is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir.2005).

ii.     **Question presented**

The question before the Court narrowly concerns arbitrability of the dispute. "In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court." *Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014)(quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir.2011)). Here, there is no contract between the parties containing an arbitration clause, so the issue turns on whether the Defendant-Claimants can invoke FINRA's arbitration rules.

LFSC is a FINRA member and Mr. Horowitz is an "associated person" of LFSC. [Dkt. 1 (Compl.) ¶¶ 1, 4]. Therefore, the Court must decide whether the Plaintiff-Respondents are obliged to arbitrate the dispute under FINRA rules, which require FINRA members to arbitrate disputes with customers when so requested by the customer. *Id.*

The issue hinges on whether Defendant-Claimants are "customers" within the meaning of FINRA Rule 12200. That rule states:

- Arbitration under the Code is either:
  (1) Required by a written agreement, or
  (2) Requested by the customer;
- The dispute is between a customer and a member or associated person of a member; and

8

- **The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.**

FINRA does not define the term "customer" except to say that a "customer shall not include a broker or dealer." FINRA Rule 12100(o).

The Plaintiff-Respondents argue that the Second Circuit adopted a bright-line rule for determining whether a FINRA claimant is a "customer" for purposes of Rule 12200 in *Abbar*, 761 F.3d at 275-76. [Dkt. 18-1 [LFSC Mem. Supp. for Prelim. Inj.] at 11]. There, the Second Circuit interpreted the term "customer" to mean a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member. *Abbar*, 761 F.3d. at 275 (citing *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011)). "By agreeing to accept "a fee for its services" or by selling securities to an entity, a FINRA member understands that it may be compelled to arbitrate if a dispute arises with that entity. This may not be a "comprehensive definition of the term," but it captures virtually all customer relationships." *Id*. (citations omitted).

In *Abbar*, the Second Circuit affirmed the district court's determination after a bench trial that a Saudi investor who transacted business with the United Kingdom affiliate of Citigroup, Inc., which was not a FINRA member, did not render him a customer of its New York affiliate, Citigroup Global Markets, Inc. *Id*. at 275. At trial, the district court found that the New York affiliate acted for the UK entity by providing technical services, and the UK entity contracted with the investor and received payment from the investor. *Id*. The Second Circuit embraced a "simple,

9

predictable, and suitably broad definition of customer," to enable the express goals of arbitration to yield economic and swift outcomes. *Id.* at 276.

By comparison, the Defendant-Claimants argue in opposition to Plaintiff-Respondents' Motion for a Preliminary Injunction that they are customers of LFSC because they were Mr. Horowitz's customers. [Dkt. 27 (Def. Mem. in Opp'n to Pl. Mot. for Prelim. Inj.) at 8-13]. They argue that the issue is controlled by the Second Circuit's decision in *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001), which rejected the argument that a similar provision to FINRA Rule 12200 in the National Association of Securities Dealers' Code required an indicia of a direct customer relationship with the FINRA Member rather than with the associated person.

### iii. Irreparable harm

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)(citing and quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-35 (2d Cir. 1999).

The Plaintiff-Respondents argue that they would suffer irreparable harm if they are forced to arbitrate a claim that they did not agree to arbitrate. [Dkt. 32-1 at 9]. The Second Circuit and district courts within the circuit have held that movants seeking a preliminary injunction to enjoin an arbitration "would be irreparably

harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)(per curiam)(quoting *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997)); see also *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010), aff'd, 405 F. App'x 550 (2d Cir. 2011)(granting stay of arbitration proceeding initiated pursuant to FINRA Rule 12200 based on the definition of "customer"). Consequently, because the Plaintiff-Respondents demonstrate that they would suffer irreparable harm per se,ced, this case turns on the second prong of the standard for injunctive relief.

    iv.    <u>Whether there are "serious questions" as to arbitrability and the balance of hardships tip decidedly in the movants favor.</u>

"The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. Because the moving party must not only show that there are "serious questions" going to the merits, but must additionally establish that "the balance of hardships tips decidedly " in its favor, its overall burden is no lighter than the one it bears under the "likelihood of success" standard. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d at 35 (internal quotations and citations omitted).

In *VCG Special Opportunities Master Fund*, the Second Circuit affirmed the district court's entry of a preliminary injunction where the claimant's status as a

11

customer of a FINRA member was a "serious question" and the hardships tipped decidedly in favor of staying the arbitration. 598 F.3d 30. There, the claimant, a hedge fund, entered into a brokerage agreement with Citigroup Global Markets, Inc., which acted as a middleman in credit default swap transactions with its sister company, Citibank, N.A. *Id*. at 32. In support of its motion for a preliminary injunction, Citigroup Global Markets argued that the hedge fund was not its "customer" under FINRA rules because the individuals identified by the hedge fund were acting as agents of Citibank, N.A., the counter-party to the credit default swaps. *Id*. at 32. The unresolved question was, as a factual matter, whether Citigroup Global Markets handled the credit default swaps at issue. *Id*. at 39. The hardships tipped in favor of staying the arbitration as it maintained the status quo and the claimant could pursue its claim if it were determined to be arbitrable by the court. *Id*. at 40.

In this case, the Court concludes that the Plaintiff-Respondents raise "serious questions" that go to the merit of whether Defendant-Claimants were there "customers" within the meaning of FINRA Rule 12200 and the hardships tip decidedly in their favor. Like *VCG Special Opportunities Master Fund*, arbitrability rests on a binary issue. If the Defendant-Claimants did not purchase a "good or service" from Mr. Horowitz they would not be his customers within the meaning of the rule. Mr. Horowitz swears that he did not receive compensation from Mr. Renison related to the sale of securities products. But whether the financial products were securities or forms of insurance is a legal conclusion. None of the allegations in the Statement of Claim nor the generalized statements in Mr.

Horowitz's 2019 letter elucidate whether any of the Claimant's were securities customers of Mr. Horowitz. Defendant-Respondents do not allege any independent basis to demonstrate that they are customers of LFSC.

The Court's preliminary review of the pleadings and filing leaves salient questions unanswered. The Court does not know when each of the Defendant-Claimants engaged Mr. Horowitz for the provision of investment advice, if any, nor the duration of their professional relationships. The parties do not explain what products they purchased from Mr. Renison for which Mr. Horowitz received any commissions, or what investment advice they received from Mr. Horowitz. The Defendant-Claimants state vaguely that they sold their initial annuities purchased from Mr. Renison and invested in ARO Equities between 2015 and 2018, but they do not explain the amount of time that elapsed between Mr. Horowitz's sales (indirectly) of any securities product and/or the provision of investment advice, and their investment with ARO Equities. These issues must be addressed by the parties during the forthcoming hearing on whether a preliminary injunction should enter.

As discussed above, the Plaintiff-Respondents will suffer irreparable harm per se if they are required to proceed with arbitrating the dispute and the Court later determines that arbitrability is lacking. The Court recognizes that, unlike the institutional investors in *VCG Special Opportunities Master Fund*, the Defendant-Claimants are elderly individual investors. However, a stay maintains the status quo, if the Court later determines that Defendant-Claimants' allegations are arbitrable, the proceedings may recommence. The case does not involve

complicated international financial transactions, but rather discrete information that is already known or could be reasonably ascertained by the parties.

Before seeking judicial intervention, the Plaintiff-Respondents sought the Defendant-Claimants' consent to stay the proceeding. When the Defendant-Claimants declined to consent to the stay, they sought a stay from FINRA itself, which was summarily denied. Plaintiff-Respondents' diligence further militates in favor of staying the arbitration proceeding.

## Conclusion

For the above stated reasons, the Court GRANTS Plaintiff-Respondents' Emergency Motion for a Temporary Restraining Order, [Dkt. 32]. A hearing date on Plaintiff-Respondents' Motion for a Preliminary injunction will be entered contemporaneous with this Temporary Restraining Order. The Plaintiff-Respondents are directed to serve a copy of this Order on FINRA's Director of Dispute Resolution Services and the parties' selected arbitrators.

                                          IT IS SO ORDERED

                                          _____/s/_____

                                          Hon. Vanessa L. Bryant
                                          United States District Judge

**Dated at Hartford, Connecticut: October 20, 2020**