UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LINCOLN FIN. SEC. CORP. and Barry Horowitz. : <br>     Plaintiffs, : <br> : <br> v. : <br> : <br> BARBARA FOSTER, ET AL. : <br>     Defendants. : <br> : <br> : <br> : | No. 20-cv-1132 (VLB) <br><br> March 29, 2021 |

## MEMORANDUM OF DECISION GRANTING PLAINTIFF BARRY HOROWITZ'S MOTION FOR A PRELIMINARY INJUNCTION, [DKT. 10]

Before the Court is Plaintiff-Respondent Barry Horowitz's motion for a preliminary injunction. [Dkt. 10]. Plaintiff-Respondents Barry Horowitz and Lincoln Financial Securities Corporation filed this action seeking a declaratory judgment and injunctive relief to enjoin Defendant-Claimants Barbara Foster, Cheryl Bonomo, and Miriam McCray from continuing with an arbitration proceeding they initiated with the Financial Industry Regulatory Authority ("FINRA") against Plaintiff-Respondents. [Dkt. 1 (Compl.)].[1] In the underlying arbitration, Defendant-Claimants allege that Mr. Horowitz, their estate planning attorney, negligently referred them to Thomas Renison for investment advice, who later defrauded them. *See generally*, [Dkt. 1-1 (FINRA Statement of Claim)].

---

[1] Lincoln Financial withdrew its motion for a preliminary injunction after the parties reached a settlement. The Court dismissed the case as to Lincoln Financial pursuant to the parties' stipulated dismissal. [Dkt. 49]

1

On October 20, 2020, the Court granted the Plaintiff-Respondents' motion for a temporary restraining order to enjoin the FINRA arbitration until the Court could rule on the Plaintiff-Respondents' motion for a preliminary injunction. [Dkt. 37 (Mem. of Decision granting TRO)]. The Court held a hearing on November 23, 2020. [Dkt. 44 (Prelim. Inj. Hr'g Audio)]. Thereafter, the Court ordered Mr. Horowitz to produce documentary support for statements contained in his affidavit concerning the scope of the referrals to Mr. Renison. [Dkt. 45]. In response, Mr. Horowitz filed another personal affidavit, his estate planning notes for Ms. Bonomo, thousands of pages of commission statements from Lincoln Financial, and the affidavit of an employee of Lincoln Financial who is familiar with the company's records. [Dkt. 46].

The sole issue before the Court is the arbitrability of the dispute which hinges on whether Defendant-Claimants are "customers" of Mr. Horowitz within the meaning of FINRA Rule 12200. The term "customer" is defined by binding Second Circuit authority, in relevant part, to mean one who purchases goods or services from a FINRA member, or by implication from an associated person. *See Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 275-76 (2d Cir. 2014). Thus, the issue of arbitrability principally concerns what financial products or services Defendant-Claimants purchased from Mr. Horowitz directly or from Mr. Renison for which Mr. Horowitz either shared commissions or received referral compensation.

After reviewing the parties' briefing and accompanying exhibits, the Court GRANTS Mr. Horowitz's motion for a preliminary injunction.

## Legal Standard for a Preliminary Injunction

Interim injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enterprise Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). "[D]istrict courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)).

As was the case with the entry of the temporary restraining order, the Second Circuit and district courts within the circuit have held that movants seeking a preliminary injunction to enjoin an arbitration "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)(per curiam)(quoting *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997)); *see also UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011)(granting stay of arbitration proceeding initiated pursuant to FINRA Rule 12200 based on the definition of "customer"). Consequently, because Mr. Horowitz demonstrates that he would suffer irreparable

3

harm *per se*, this case turns on the second prong of the standard for injunctive relief.

## Background

The Court will repeat the salient facts as detailed in its decision granting Plaintiff-Respondents' motion for a temporary restraining order and supplements them with additional facts of record. The parties agree on most of the essential facts. *See* [Dkt. 27 (Def-Clmts' Mem. in Opp'n) at 6].

Plaintiff-Respondent Barry Horowitz is an estate planning attorney. [Dkt. 51 (Answer) ¶ 11](admit). Defendant-Claimants Barbara Foster, Miriam McCray, and Cheryl Bonomo were estate planning clients of Mr. Horowitz's law firm. [Answer ¶ 13](admit); *see also* [Statement of Claim at 3]. Mr. Horowitz filed copies of Legal Service Agreements entered into by his law firm, Nirenstein, Horowitz & Associates, P.C. and each of the Defendant-Claimants. [Dkt. 10-2]. The agreements are dated: Barbara Foster [10/06/2005, 11/29/2012, 3/05/2018, and 01/31/2019]; Miriam McCray [10/27/2005]; and Cheryl Bonomo [01/25/2008]. Although there is some variation in certain language in the agreements and the scope of the estate planning services provided, their essential terms are the same.

Lincoln Financial is a FINRA member and Mr. Horowitz was an "associated person" at all times relevant under the FINRA Rules. [Statement of Claim at 2]. The Statement of Claim alleges that Mr. Horowitz intended to use his securities licenses to recommend investment advisors to his law firm clients, for which he would receive referral compensation, rather than provide investment advice. [*Id*. at 3]. Mr.

4

Horowitz could not receive this referral compensation absent securities licenses and an association with a FINRA member. [Def-Clmts' Mem. in Opp'n at 2]; *see also* FINRA Rule 2040. Mr. Horowitz also referred his law firm clients to Thomas D. Renison, an insurance agent, for their insurance-based needs. [Answer ¶ 17](admit). Lincoln Financial approved Mr. Horowitz to refer law firm clients to Mr. Renison for compensation. [Statement of Claim at 3].

According to the Statement of Claim, Mr. Renison was previously registered with Lincoln Financial until approximately 2008 and he and Mr. Horowitz were supervised by the same individual. [Statement of Claim at 4-5]. After a brief departure, Mr. Renison sought to return to Lincoln Financial, but the firm would not re-associate with him because of customer complaints. [*Id.*]. Instead, the firm allowed Mr. Horowitz to continue to refer his law firm clients to Mr. Renison. Mr. Renison operated his brokerage in space that he rented from Mr. Horowitz's law firm. [*Id.* at 4].

In April 2010, the Maine Securities Division initiated an enforcement action against Mr. Renison over fraudulent investment activity. [*Id.* at 6]. He was arrested on federal wire fraud charges in June 2011, but the charges were later dropped in exchange for his testimony against a co-conspirator under a grant of immunity. [*Id.* at 8, n. 7]. He was barred from the securities industry by the SEC in 2014. [*Id.* at 7]. Mr. Horowitz terminated his relationship with Mr. Renison in 2013, but allegedly failed to warn clients that he previously referred to Mr. Renison that continuing to invest with Mr. Renison may be detrimental to their interest. [*Id.*]. Between 2015 to 2018, with specific dates unspecified, Defendant-Claimants sold their annuities,

5

other investments, and insurance policies purchased through Mr. Renison to invest in the ARO Equity fund on Mr. Renison's advice. [*Id.* at 9-11, 13-14]. The ARO Equity fund was a fraud scheme perpetrated by Mr. Renison and others. [*Id.* at 8-10]. In June 2019, Mr. Horowitz sent a letter to Ms. Bonomo warning that investing with Mr. Renison may be detrimental. [Dkt. 27-1 (Def. Ex. 1 in Opp'n Pl. Mot. for Prelim. Inj.) Ltr. from Horowitz to Bonomo]

Mr. Horowitz attests that he never provided investment advice to the Defendant-Claimants. [Dkt. 10-2, Def. Mem. in Supp. of TRO (Horowitz Aff.) ¶ 11]. Specifically, Mr. Horowitz attests that he referred the Defendant-Claimants to Mr. Renison "solely for consultations regarding non-securities products, such as life insurance, long-term care insurance, and fixed index annuities." [*Id.* ¶ 12]. Mr. Horowitz attests that he never received compensation from Mr. Renison related to the sale of securities products to the Defendant-Claimants. [*Id.* ¶ 13]. As the Court addressed in the hearing on the motion for a preliminary injunction, whether a financial product is a security or insurance is a question of law. [Hr'g Audio at 13:00-13:55]. *See also* [Dkt. 37 (Mem. of Decision granting TRO) at 3](briefly explaining the difference between insurance and securities).

Thereafter, Mr. Horowitz filed over 3,600 pages of commission records from Lincoln Financial. [Dkt. 46-2]. The records were accompanied by the affidavit of Betsy Johnson, a senior paralegal employed by Lincoln Financial, who was personally familiar with the firm's record system for commission statements. [*Id.*]. Ms. Johnson attests to the authenticity of the records and that none of the Defendant-Claimants' names appear in the commission records. [*Id.* ¶¶ 9-10].

6

Lincoln Financial previously filed an affidavit of an assistant vice president attesting that the Defendant-Claimants never had an account with the company. [Dkt. 18-3 (Aff. of Brian Dixon) ¶ 4]. Mr. Horowitz filed another personal affidavit stating that at all times, he was licensed to provide investment services through Lincoln Financial alone and any compensation paid to him for securities products or services would have been reflected in their records. [Dkt. 46-1 (Horowitz Suppl. Aff.) ¶ 15]. The Defendant-Claimants do not claim to have ever purchased any securities from Mr. Horowitz or Lincoln Financial.

Additionally, Mr. Horowitz filed a copy of his handwritten estate planning notes for Cheryl Bonomo. [Dkt.46-1 (Client Information)]. The note states "Renison-L/T Care Ins. or Life Ins. for Long Term Care." [*Id.*]. Mr. Horowitz attests that he also reviewed the firm files of Defendant-Claimants McCrary and Foster, but he did not locate similar notes regarding the nature of the referral. [Dkt. 46-1 (Horowitz Aff.) ¶ 12]. Mr. Horowitz attests that he does not have records of any compensation received from Mr. Renison related to the Defendant-Claimants' purchase of any investment. [*Id.* ¶ 14].

## Discussion

"In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir.2011).

FINRA Rule 12200 states:

- Arbitration under the Code is either:

    (1) Required by a written agreement, or

    (2) Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA does not define the term "customer" except to say that a "customer shall not include a broker or dealer." FINRA Rule 12100(o). Contrary to Plaintiff's position, the Second Circuit rejected the argument that FINRA Rule 12200 should be construed in favor of arbitration. *Abbar*, 761 F.3d at 274.  The court reasoned in *Abbar*, that "[b]ecause the parties here are disputing the existence of an obligation to arbitrate, not the scope of an arbitration clause, the general presumption in favor of arbitration does not apply." *Id*. (citing *Applied Energetics, Inc. v. NewOak Capital Mkts*., LLC, 645 F.3d 522, 526 (2d Cir.2011)). "Therefore, the word "customer" must "be construed in a manner consistent with the reasonable expectations of FINRA members." *Id*. (quoting *VCG Special Opportunities Master Fund*, Ltd., 661 F.3d at 171).

In *Abbar*, the Second Circuit held that the term customer means "…one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Id*. at 275. The Second Circuit envisioned that the "bright line" test can, in most cases, be readily applied to undisputed facts. *Id*. at 276. "The only relevant inquiry in assessing the existence of a customer relationship is whether an account was opened or a purchase made;

parties and courts need not wonder whether myriad facts will "coalesce into a functional concept of the customer relationship." *Id.* at 276.

The Second Circuit did not interpret what is meant by the "business activities of a member" in *Abbar* because there was no dispute that the services provided were investment banking. The term is not defined by FINRA. *See* FINRA Rule 13100, Definitions. In *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 325 (4th Cir. 2013), the Fourth Circuit interpreted "business activities of a member" to mean "investment banking or securities business," based on the language of FINRA Rule 12100(r) and the context of FINRA's mission and regulatory interest. *Id.*

The Court agrees with the Fourth Circuit's reasoning in *Carilion Clinic* as to what is meant by the "business activities of a member." Pursuant to FINRA Rule 12100(r), a person associated with a member means, in relevant part, (2) A sole proprietor, partner, officer, director, or branch manager of a member, *or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member*, whether or not any such person is registered or exempt from registration with FINRA under the By–Laws or the Rules of FINRA." (emphasis added).

A "customer" of an associated person can compel arbitration against an associated person under FINRA Rule 12200 even if the "customer" does not hold an account or transact business with the FINRA member itself, i.e. Lincoln Financial. *Abbar*, 761 F.3d at 274 ("In short, the rule requires a FINRA member to

9

arbitrate disputes with its 'customers,' or the 'customers' of its 'associated persons.' "); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir.2001); *see also Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 396–97 (E.D.N.Y. 2014)(…"customer of a FINRA member's associated person is entitled to arbitrate against the member itself as long as the claim arises out of the associated person's business activities.")(citing *John Hancock*). The application of the term "customer" is the same regardless of whether the claim is against the associated person of the FINRA member or the member itself. *See* FINRA Rule 12200 ("The dispute is between a customer and a member *or associated person of a member*; and "The dispute arises in connection with the business activities of the member *or the associated person*, ...")(emphasis added).

In sum, arbitration under the FINRA Code may be compelled against a FINRA member or its associated person when: (1) requested by the purchaser of a good or service from a FINRA member or associated person, or an account holder and (2) the dispute arises in connection with the investment banking or securities business activities of a member or associated person.

During the hearing, Mr. Horowitz argued that the lapse of time severs any "customer" relationship that may have existed because there is no evidence that he was aware that Defendant-Claimants continued to engage with Mr. Renison or knew of the existence of the ARO Equity fund. [Hr'g Audio at 29:32-34:42]. The Defendant-Claimants disagree that the passage of time absolves Mr. Horowitz, arguing that Mr. Horowitz was negligent in referring his clients to Mr. Renison from the onset "for any purposes whatsoever that would place their funds in his hands.

10

The issue is not the purpose of the referral but that a referral to Mr. Renison was made at all." [Pl. Mem. in Opp'n at 20]. This is a merits issue to be decided by the arbitrator if the claim is arbitrable. There is no "wholly groundless" exception to arbitrability. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019)(unanimous). In other words, if the Defendant-Claimants were Mr. Horowitz's customers but the damages or harm were too remote (in one case, ten years later) to be proximately caused by Horowitz's "business activities," the issue would have no effect on arbitrability.

To date, there has been no evidence to establish that Mr. Horowitz received any compensation for securities products or investment advice or services either directly from the Defendant-Claimants or indirectly through Mr. Renison. During the preliminary injunction hearing, the Defendant-Claimants clarified their position that their dispute is arbitrable based on fees they paid directly to Mr. Horowitz for services outlined in their Legal Services Agreements which renders them "customers" under the FINRA code. [Hr'g Audio at 50:18-51:16]. The Court disagrees.

The terms of the agreements at issue make clear that they are between Mr. Horowitz's law firm and each of the Defendant-Claimants for the provision of legal estate planning services only. The Defendant-Claimants entered into "Legal Services Agreements with Mr. Horowitz's law firm. [Dkt. 10-2]. Mr. Horowitz is not a party to the legal services agreements. *Id.* Estate planning involves "preparation for the distribution and management of a person's estate at death through the use of wills, trusts, insurance policies, and other arrangements, esp. to reduce

11

administration costs and transfer-tax liability." ESTATE PLANNING, Black's Law Dictionary (11th ed. 2019). Estate planning creates the vehicles in which assets are held and by and through which assets are disbursed. It does not encompass the suitability of those assets or their attendant risks.

Section two, titled "Legal Services to be provided," states that "Law Firm will prepare an estate planning portfolio with the following estate planning documents for Client," and sets forth a list of documents to be prepared, e.g. pour over wills, living will, trusts, anatomical gift declaration, which are individualized for each client. [*Id*.].

Section three specifies the flat fees that the Defendant-Claimants are obliged to pay the law firm upon completion of the estate plan and substitute hourly rates for attorney time and paralegal time if the client cancels the estate plan prior to its completion. [*Id*.].

Section five is titled "Notice of Team Approach," which discloses that the relationship between the law firm and other financial services organizations. [*Id*.]. For example, Ms. Foster's 2005 engagement letter provides, in relevant part:

> To help implement clients' estate plans or other financial objectives, Law Firm often works with the Connecticut Financial Group, a financial services company (Financial Firm) and other financial services organizations (collectively "the Financial Services Organizations"). *In this team approach, Law Firm provides legal advice and creates estate planning documents, and Financial Services Organizations provide investment advice, insurance and/or other financial products or services* and assist Law Firm in collecting financial information from its clients. … This means that any fees or commissions paid to Financial Firm may also benefit members of Law Firm and work referred by Law Firm to Financial Services Organizations may benefit the Law Firm itself. (emphasis added)

> ... *Working with the Financial Services Organizations or working with another company will have no bearing on the fees charged by Law Firm for work performed in preparing Client's estate plan.* (emphasis added)
>
> If Client chooses to have the Financial Services Organizations (i) provide investment advice, insurance and/or other financial products or services, or (ii) collect financial information from Client to assist Law Firm in the preparation of Client's estate plan, Client expressly waives the attorney/client privilege and any conflict of interest … Client should consider seeking advice of independent counsel in the transaction as well. ...
>
> Investment services are not covered by the Law Firm's legal liability insurance though they are covered by liability insurance maintained by the Financial Services Organizations or their members.

In essence, while the agreements vary in some non-material respects, they explain the scope of the legal engagement. Section five of each of the engagement agreements makes clear that whether the client elects to purchase investment advice, insurance, or financial services from the Connecticut Financial Group (Mr. Renison's firm), or another financial services organization has no bearing on the attorney's fees charged by the firm for preparing the estate plan. Thus, compensation that Mr. Horowitz's law firm received for legal services rendered does not support Defendant-Claimants' argument that they were "customers" of Mr. Horowitz as it relates to investment banking or securities.

On the other hand, the engagement letters make clear that they do not foreclose the possibility of a "customer" relationship under the FINRA rule because the law firm is disclosing the existence of potential referral compensation for investment products or services. Indeed, there is agreement that Mr. Horowitz maintained securities licenses and his association with Lincoln Financial in order to share in these commissions. It necessarily follows that if the Defendant-Claimants purchased an investment instrument from Mr. Renison or another financial adviser

and Mr. Horowitz shared in the transaction-based compensation, they are his "customers."

The issue is not whether the transaction is too attenuated or whether a general referral was made, but simply whether the Defendant-Claimants purchased an investment instrument directly or indirectly from Mr. Horowitz. The Defendant-Claimants have adduced no evidence that they purchased an investment instrument from Mr. Renison or Mr. Horowitz or that Mr. Horowitz received any compensation for, or related to, their purchase of an investment instrument.

The Defendant-Claimants point to a letter from Mr. Horowitz to Defendant-Claimant Cheryl Bonomo dated June 5, 2019 stating that, "many years ago, I referred you to Thomas Renison to assist you with your financial planning needs. Although I am not certain if you chose to use Mr. Renison as your investment adviser, I wanted to alert you to some disturbing information we learned about Mr. Renison." [Dkt. 27-1 (Def. Ex. 1 in Opp'n Pl. Mot. for Prelim. Inj.)]. The letter concludes, "we suggest you seek other financial advice from a different financial adviser" and offers to refer Ms. Bonomo to a different "financial adviser." [*Id.*]. This letter refutes, rather than supports, Defendant-Claimant's contentions.

Conceptually, "financial planning" does not necessarily implicate the provision of investment advice. For instance, recommending the purchase of a term life insurance policy, or even recommending that a person open a savings account instead of keeping money under their mattress, is "financial planning" advice but is wholly distinct from investment advice or investment banking.

Moreover, the letter suggest Mr. Horowitz did not receive nor was entitled to receive any compensation for Defendant-Claimant's purchase of investment products. It states, "I am not certain if you chose to use Mr. Renison as your investment adviser." Had they purchased investment products from Mr. Renison for which Mr. Horowitz received a fee, he would know that they did use him. Further, the truth of that statement is buttressed by the commission records produced by Lincoln Financial in this case.

The Defendant-Claimants are in the best position to know what products they purchased from Mr. Renison prior to their failed investments in ARO Equity. In the absence of that evidence, Mr. Horowitz has established the negative by a clear showing. The unrefuted commission statements demonstrate that Mr. Horowitz did not receive any compensation through Lincoln Financial for investment products sold by Mr. Renison to any of the Defendant-Claimants. Mr. Horowitz has also reasonably established that if he received any compensation for investment products sold by Mr. Renison, it would be reflected in Lincoln Financials' records because, during the relevant period, Mr. Horowitz was only licensed to receive compensation for investment products sold through Lincoln Financial and no such records exist. [Dkt. 46-1 (Horowitz Aff.) ¶ 15].

The precedent principally advanced by the Defendant-Claimants, *Triad*, is distinguishable because it was undisputed that an investment transaction with the associated person occurred and it was the subject of the claim in arbitration. In *Triad*, an investor worked with an associated person of the FINRA member to identify a real estate investment that would qualify for certain tax advantages

following the sale of another holding. 60 F. Supp. at 395-96. After the associated person determined that the investor was not interested in any of their offerings, he referred the investor to an independent real estate venture. *Id.* at 396. The real estate venture paid the associated person a finder's fee for the referral after the investment was placed. *Id.* The associated person continued to correspond with the investor regarding the real estate venture's offering, but apart from the finder's fee, received no other compensation. *Id.*

The district court held that the dispute with the FINRA member who supervised the associated person was arbitrable because the associated person "provided them with a service—investment advice and an introduction, and at least some effort to facilitate the [real estate venture] transaction—and received "transaction—based selling compensation" from [real estate venture] as a result." *Id.* at 397. The *Triad* court held that the source of the compensation was immaterial; but compensation was nevertheless paid. *Id.* at 398. Here, there is no evidence that Mr. Renison paid Mr. Horowitz any transaction-based compensation, be it a referral fee or shared commissions.

Because the Court concludes that Mr. Horowitz has demonstrated by a clear showing that he is likely to succeed on the merits, the Court grants his motion for a preliminary injunction barring the Defendant-Claimants from proceeding with the FINRA arbitration. Because the Court concludes that the Defendant-Claimants do not appear to be "customers" within the meaning of FINRA Rule 12200 and there is no other basis for arbitration asserted, the Court declines to consider whether the civil action filed by Ms. Bonomo against Mr. Horowitz's law firm precludes

arbitration over her claims under FINRA Rule 12209 or the prior and pending action doctrine.

## Conclusion

For the above stated reasons, the Court GRANTS Mr. Horowitz's motion for a preliminary injunction to enjoin the FINRA arbitration. Given the scope of this ruling, the Court turns to the remaining issues to be decided before final disposition of the case.

The Court has concluded that the Defendant-Claimants failed to show that they paid any direct compensation to Mr. Horowitz, despite their argument that legal engagement letters were the contrary. The evidence presented thus far reasonably demonstrates that Mr. Horowitz did not receive any direct or indirect compensation from Defendant-Claimants through Mr. Renison.

At this juncture, the Defendant-Claimants sole remaining argument is their speculation that Mr. Renison must have paid Mr. Horowitz for the referral based on the economic assumption that a referral is unlikely to be gratuitous. [Hr'g Audio at 1:24:10-1:27:37]. This assumption, without evidentiary support, would be insufficient to defeat summary judgment. *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)(A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.").

In *Abbar*, the Second Circuit considered that whether goods or services were purchased from a FINRA member, and by extension, an associated person, is

17

ordinarily a straightforward inquiry. 761 F.3d at 276. When it is unclear, discovery and perhaps trial is necessary; but even then, a detailed examination by the Court is unnecessary. *Id*. The Court was surprised and disappointed to learn during the hearing on the motion for a preliminary injunction that the parties had not exchanged the mandatory initial discovery disclosures. Fed. R. Civ. P. 26(a)(1)(B). Had the parties done so, the action could likely have been resolved without further expense to counsels' clients or outlay of judicial resources.

Absent an interlocutory appeal of this decision, the Court presents the following options and directs the parties to confer and file a status report within 35 days regarding their preferences:

(1) The Defendant-Claimants could request that the Court convert the preliminary injunction into a final remedy and enter judgment for Mr. Horowitz;

(2) The parties could propose a discovery plan, within the limitations of *Abbar*; and/or

(3) The Court could refer the case for a settlement conference before a magistrate judge which would enable the parties to explore a potential global resolution of the arbitrability issue and the underlying claims.

It is so ORDERED.

Dated at Hartford, Connecticut, this 29th day of March 2021

                                              /s/
                                      Vanessa L. Bryant
                                      United States District Judge